IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> BUTTONWOOD FINANCIAL GROUP, LLC and JON MICHAEL MCGRAW, <br><br> Defendants. | Case No. 4:21-cv-686 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

### SUMMARY

1. Defendant Buttonwood Financial Group, LLC ("Buttonwood") and its principal, Jon Michael McGraw ("McGraw"), are investment advisers that manage more than $500 million in assets for hundreds of advisory clients. As investment advisers, Buttonwood and McGraw owe their advisory clients a fiduciary duty to act in their clients' best interests. This fiduciary duty includes a duty of loyalty to fully disclose all material facts about the advisory relationship by disclosing, among other things, any conflicts of interest that may cause them to put their own interests before those of their clients. Buttonwood and McGraw also owe their clients a duty of care, which includes seeking best execution for clients. From at least 2014, Buttonwood and McGraw repeatedly breached their fiduciary duty to their advisory clients by failing to disclose certain conflicts of interest and selecting investments that were not in their clients' best interest.

2.      Nearly all of Buttonwood and McGraw's clients were "wrap fee" clients: clients paid Buttonwood an all-in annual advisory fee that covered not only Buttonwood and McGraw's investment advice, but also the transaction costs, if any, of securities trades made on that advice. As a result, Buttonwood—and McGraw through his majority ownership interest in and profit participation from the firm—benefitted when a wrap fee client's trades incurred no or lower transaction costs because Buttonwood retained a larger share of the client's fee when it incurred lower out-of-pocket expenses. In contrast, Buttonwood would incur more expenses (and thus retain less of a wrap fee client's annual fee) if the client's trades incurred higher transaction costs that Buttonwood was responsible for paying.

3.      In violation of their fiduciary duty to their clients, Buttonwood and McGraw did not disclose that they had an incentive to select investments for which Buttonwood would not pay any transaction costs, including more expensive mutual fund share classes. In addition, during the relevant period, Buttonwood avoided paying millions of dollars in transaction fees by repeatedly investing clients in more expensive share classes of mutual funds when less expensive share classes of those same mutual funds were available to clients, thereby also breaching their fiduciary duty to their clients to obtain best execution.

4.      Specifically, Buttonwood and McGraw exercised discretion to invest wrap fee clients heavily in mutual funds. Many mutual funds have different share classes with differing internal expenses—some more expensive, some less expensive to an investor—yet all share classes of the same mutual fund are invested in the same underlying assets. Differences in performance between share classes are thus attributable to the differences in the share class expenses.

5.      Buttonwood's agreement with its third-party broker (the "Broker") provided that Buttonwood would pay a $25 transaction fee when wrap account clients purchased or sold certain

share classes of mutual funds, but did not charge Buttonwood a transaction fee when the adviser selected other share classes of mutual funds with higher internal expenses. This included when a mutual fund had at least two share classes within the same fund: the Broker charged Buttonwood a $25 transaction fee to purchase the share class with lower internal expenses, but did not charge Buttonwood a transaction fee to purchase the share class of the same mutual fund with higher internal expenses. Buttonwood and McGraw therefore had a financial conflict of interest with their clients—they had an incentive to select investments for clients that would allow Buttonwood to avoid having to pay transaction fees and cause clients to incur higher expenses. Buttonwood and McGraw, however, failed to disclose this conflict of interest to their clients.

6. For years, Defendants acted on this conflict of interest by almost always selecting mutual fund investments for clients for which the Broker did not charge Buttonwood a transaction fee. Moreover, when investing clients in mutual funds, Buttonwood and McGraw were almost always selecting the share class with higher expenses even though under the circumstances it was in their advisory clients' best interest, and consistent with their duty to seek best execution, to select a different share class of the exact same fund that was available to clients and had lower expenses. In doing so, Buttonwood repeatedly put its interest in not paying the transaction fees ahead of its clients' interests to earn greater returns.

7. Buttonwood, however, never told clients what it was doing or otherwise disclosed the conflict of interest, and how that conflict provided an incentive for Buttonwood to put its financial interest ahead of its clients' interests.

8. In 2016, Buttonwood and McGraw took further steps to gain a financial advantage for themselves by investing clients in more expensive mutual funds share classes. Upon Defendants' request, Buttonwood's Broker agreed that in exchange for Buttonwood investing no

less than 60% of all client assets in share classes of mutual funds for which the Broker did not charge Buttonwood a transaction fee (*i.e.*, generally more expensive mutual funds), the Broker would waive all transaction fees on any other mutual fund or equity stock trades making up the remaining 40% of Buttonwood client assets. This "60/40" arrangement exacerbated Defendants' existing conflict of interest: to obtain even more financial benefits for the firm in the form of avoiding additional transaction costs, Buttonwood and McGraw had an even greater incentive to invest at least 60% of wrap fee client assets in more expensive, lower-performing mutual fund investments to the detriment of these clients.

9. Buttonwood, however, still did not disclose to clients its conflict of interest or the "60/40" arrangement until 2020, during the SEC's investigation. Buttonwood and McGraw's failure to disclose these facts violated their fiduciary duty once again.

10. By engaging in the forgoing conduct, Buttonwood and McGraw violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2), and Buttonwood violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)(1) and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 80b-14(a).

10. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

11. Venue is proper in this district pursuant to Section 214(a) of the Advisers Act, 15 U.S.C. § 80b-14(a), and 28 U.S.C. § 1391(b)(1) and (2), because, among other things,

Defendants inhabit, reside, and transact business in this district, and certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## THE DEFENDANTS

12.     Defendant Buttonwood is a Missouri limited liability company, headquartered in Kansas City, Missouri.  Buttonwood has been registered with the Commission as an investment adviser since 2009.  As of March 31, 2021, Buttonwood had approximately $511 million in regulatory assets under management.

13.     Defendant McGraw resides in Kansas City, Missouri, and is the founder, president, sole managing member, and majority owner (owning approximately 86%) of Buttonwood.  He has also been the chief compliance officer of the firm since September 2018.

## FACTUAL ALLEGATIONS

### Buttonwood's Advisory Business and Wrap Fee Program

14.     From 2014 through at least 2019 (the "Relevant Period"), Buttonwood provided both investment management and financial planning services to its advisory clients, with a focus on serving multi-generational families.

15.     During the Relevant Period, Buttonwood and McGraw were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because each was engaged in the business of providing investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.

16.     In exchange for Buttonwood and McGraw's advisory services, Buttonwood generally charged its clients advisory fees equal to a percentage of the dollar amount of the client's assets under management.

17. In order to register with the SEC as an investment adviser, Buttonwood must file with the SEC a Form ADV. Part 2A of Buttonwood's Form ADV is a narrative brochure ("Brochure") and the information that the SEC requires Buttonwood to include, among other things, a clearly written, meaningful current disclosure of Buttonwood's business practices.

18. In its Brochure, which Buttonwood provided to its investment advisory clients, Buttonwood described its services as follows:

> Buttonwood provides fee-based investment management services under two general platforms. Under the "Wrap Fee Program", [sic] clients receive portfolio management, custodial, reporting, and clearing services for one all inclusive fee … Outside of the Wrap Fee Program, clients pay a separate investment management fee that does not include trading and other costs.
>
> In managed accounts, Buttonwood may invest in a variety of investment classes and investment vehicles, including stocks, bonds, mutual funds, and exchange traded funds, among others.

19. Accordingly, advisory clients in Buttonwood's wrap fee program were not responsible for paying transaction fees associated with their investments in "stocks, bonds, mutual funds, and exchange traded funds." Under the terms of its wrap fee program, Buttonwood had to pay the Broker for any trading costs (*e.g.*, transaction fees) the Broker charged for trades in Buttonwood's advisory clients' accounts.

20. Most of Buttonwood's advisory clients participated in Buttonwood's wrap fee program in the Relevant Period. As a result, about 80% of Buttonwood's assets under management during the Relevant Period were in wrap fee accounts.

21. Buttonwood typically managed the wrap fee accounts on a discretionary basis, meaning that advisory clients had granted Buttonwood the authority to trade the assets in their advisory accounts without Buttonwood needing to obtain specific approval from the client. Buttonwood actively managed and frequently rebalanced clients' wrap fee accounts.

22.     As part of the wrap fee agreement, Buttonwood agreed to pay "all trading" costs in exchange for the advisory fee it charges clients.

23.     Buttonwood typically invested clients' wrap fee accounts in mutual funds, stocks, and bonds, with a heavy emphasis in mutual funds.

24.     During the Relevant Period, McGraw was a member of Buttonwood's investment policy committee and every other member of that committee reported to McGraw.

25.     During the Relevant Period, the investment committee made all investment decisions relating to client wrap account assets.

26.     Given his central role and supervision of the investment policy committee, McGraw managed client accounts and provided investment advice to Buttonwood's advisory clients for compensation.

### Background on Mutual Funds, Share Classes, and Associated Fees

27.     Mutual funds are common investments for individuals.  A mutual fund is a professionally managed investment fund that pools money from many investors and invests the money in securities or other assets.  A mutual fund has various expenses that are paid from fund assets.  These internal expenses are reflected in the fund's "expense ratio."  Such expenses include fees paid to the adviser that manages the mutual fund, operational expenses, and fees paid to the brokers that sell shares of, and provide services to, the mutual fund.  These are ongoing fees and expenses charged throughout the life of the mutual fund investment.  Fees and expenses are an important consideration in selecting a mutual fund because these charges lower an investor's returns.

28.     A mutual fund frequently offers investors different "share classes."  Each class will invest in the same "pool" or portfolio of securities and other assets, but each class will have

different fees and expenses and, therefore, different returns. For example, some share classes have higher expense ratios because they pay brokers more for selling or servicing that particular share class. In contrast, other share classes of the same fund may have lower internal fees and expenses. A single mutual fund will often have share classes with different expense ratios, with the share classes that have higher expense ratios generally having lower returns than share classes with lower expense ratios. In other words, an individual investor may pay more, or less, for precisely the same mutual fund investment, depending on the share class. These internal fees and expenses are in addition to any fees a broker may directly charge customers on particular share classes, such as transaction fees at the time of buying or selling the fund shares. Different mutual fund share classes often have different eligibility criteria, and generally only investors who meet a class's eligibility criteria may purchase that class.

29. As an example, some mutual fund share classes charge fees pursuant to Rule 12b-1 under the Investment Company Act of 1940 ("12b-1 Fees") to cover fund distribution and shareholder service expenses (*e.g.*, "Class A" shares). These 12b-1 Fees are recurring, are included in the total annual operating expenses for that share class, and generally range from 25 to 100 basis points per year (equal to 0.25% to 1.00%), and are paid to the fund's distributor or principal underwriter. In general, the fund's distributor or principal underwriter will then remit these 12b-1 Fees to the broker that distributed or sold the shares.

30. Many mutual funds also offer share classes that do not charge 12b-1 Fees (*e.g.*, "Institutional Class" or "Class I" shares). An investor who holds these types of mutual fund shares will usually pay lower total annual fund operating expenses over time—and thus will generally earn higher returns—than one who holds a share class of the same fund that charges 12b-1 Fees. Therefore, if a mutual fund offers Institutional or Class I shares that do not charge 12b-1 Fees and

an investor is eligible to own those shares, it may be better for the investor to purchase or hold the these shares than the higher-cost Class A shares that charge 12b-1 Fees. Many mutual funds make Class I shares available to investors who are purchasing their shares through advisory accounts.

31.     For Defendants' advisory clients, the Broker did not charge Buttonwood transaction fees on mutual fund investments that charged 12b-1 Fees (no-transaction-fee or "NTF" mutual funds), and these 12b-1 Fees were paid to the Broker. In contrast, the Broker charged Buttonwood a $25 transaction fee on mutual fund investments that did not charge a 12b-1 Fee (transaction fee or "TF" mutual funds).

### Buttonwood and McGraw's Fiduciary Duties to Their Clients

32.     As investment advisers, Buttonwood and McGraw are fiduciaries for their advisory clients. As such, they owe their clients a duty of loyalty, which includes an affirmative duty of utmost good faith, to provide full and fair disclosure of all material facts, and to employ reasonable care to avoid misleading their clients. Buttonwood and McGraw's duty to disclose all material facts includes a duty to tell clients about actual or potential conflicts of interest that might incline Buttonwood and McGraw to render investment advice that is not disinterested. In addition, Buttonwood and McGraw had a separate duty of care, including a duty to seek best execution when placing client trades with a broker-dealer.

33.     Buttonwood and McGraw acknowledged this fiduciary duty in, among other places, their Brochure and compliance manual. Buttonwood and McGraw represented to clients in Buttonwood's Brochure that Buttonwood had adopted a Code of Ethics that "outlines our high standard of business conduct and fiduciary duty to Clients."

34.     Further, Buttonwood's compliance manual—which all Buttonwood personnel were required to follow in carrying out their work at Buttonwood—contained the firm's written

compliance policies. The Buttonwood compliance manual affirmed that Buttonwood is "a fiduciary to its advisory clients." Moreover, the compliance manual explained that:

> A fiduciary is a professional entrusted with certain responsibility, such as responsibility for the management of a Client's assets. The management authority [Buttonwood] accepts may include the discretionary power to act on behalf of and for the benefit of the Client. All decisions or recommendations made by a fiduciary on behalf of a client <u>must be made solely in the best interests of the client</u>.

(Emphasis in original.)

35.     The Buttonwood compliance manual stated that Buttonwood's fiduciary duties included "[f]ull disclosure of all material facts," "[f]ull disclosure of potential conflicts of interest," "[u]tmost and exclusive loyalty and good faith," "[b]est execution of client transactions," and "[e]xercise of reasonable care to avoid misleading clients."

36.     In addition, with respect to best execution, the Buttonwood compliance manual stated that:

> [Buttonwood] has a fiduciary duty to seek to achieve best execution when it places trades with broker-dealers. Best execution for a given client trade is generally considered to be achieved when the trade is executed so that the client's total costs or proceeds in the transaction are the most favorable under the circumstances.

### Buttonwood's Relationship with Its Unaffiliated Broker

37.     During the Relevant Period, the Broker maintained custody of client assets in Buttonwood's wrap fee program and executed all securities trades for those Buttonwood wrap fee accounts. The Broker received 12b-1 Fees whenever Buttonwood clients invested in mutual funds or mutual fund share classes that charged 12b-1 Fees.

38.     Before November 2016, pursuant to a pricing agreement between Buttonwood and the Broker, the Broker charged Buttonwood transaction fees for all trades in client wrap fee accounts in TF mutual funds and equity trades. For example, the Broker charged Buttonwood

$25.00 for any client transaction in a TF mutual fund, and, depending on the size of the transaction, a base amount of $8.95 to $19.95 for all client equity trades.

39.     The Broker, however, did not charge Buttonwood transaction fees for client trades in NTF mutual funds.

40.     Here, when Buttonwood wrap fee clients invested in NTF mutual funds, the Broker received payments from the mutual funds, which would include any 12b-1 Fees for those NTF investments.

41.     There were usually lower-cost share classes of the exact same NTF mutual fund. The Broker made these lower cost share classes available to Buttonwood clients, but charged a transaction fee to Buttonwood on these TF mutual funds.

42.     A Buttonwood client who held mutual fund shares in a wrap account for which the Broker did not charge a transaction fee would pay higher total annual fund expenses over time—and would therefore earn lower returns—than one who held a lower-fee TF share class of the same fund.

43.     During the Relevant Period, Buttonwood invested client wrap accounts primarily in NTF mutual funds for which the Broker did not charge a transaction fee.

44.     During the Relevant Period, nearly all of the NTF mutual funds invested in by Buttonwood client wrap accounts were mutual funds that had both TF and NTF versions, both of which were available from the Broker.

45.     And so for nearly all of its clients' mutual fund investments during the Relevant Period, Buttonwood decided to invest clients in higher-cost NTF versions of mutual funds to avoid transaction fees that Buttonwood would be contractually obligated to pay had it instead invested clients in lower-cost TF versions of the same mutual funds.  As a result, clients earned lower returns on these investments.

**Buttonwood and McGraw Make a Deal with the Broker to Reap Additional Financial Benefits By Putting Clients in Poorer Performing Investments**

46.     In June 2016, McGraw sought to improve Buttonwood's pricing terms with the Broker so that Buttonwood could further lower its expenses.

47.     As part of these discussions, McGraw communicated to the Broker that Buttonwood might take its business to another unaffiliated broker-dealer unless the Broker agreed to lower its pricing. McGraw then proposed to the Broker that Buttonwood pay no transaction fees on all mutual fund and equity trades.

48.     In exchange, Buttonwood would agree to maintain no less than 60% of its wrap fee client assets in NTF mutual funds.

49.     McGraw understood that the Broker was receiving 12b-1 Fees on these client investments. He has admitted that he believed the Broker wanted this NTF-heavy asset allocation because these 12b-1 fees were a "revenue stream" for the Broker, who was "making money off of NTF funds" invested in by Buttonwood and McGraw's advisory clients.

50.     The Broker agreed to this 60/40 arrangement and the arrangement commenced in November 2016.

51.     After entering into the 60/40 arrangement, Buttonwood tracked its clients' overall investments by security to ensure that at least 60% of all wrap fee client assets were in higher cost NTF mutual funds in accordance with the terms of the arrangement.

52.     Buttonwood adhered to the 60/40 ratio as long as the arrangement remained in effect.

53.     Following the 60/40 arrangement, Buttonwood continued to invest clients heavily into the more expensive NTF mutual funds in order to avoid paying transaction fees on not just mutual funds, but also on all equities trades by its wrap fee clients. This resulted in harm to

Buttonwood's clients since nearly all of the NTF mutual funds had a lower-cost share class for the same mutual fund available, but with a transaction fee.

54.     The 60/40 arrangement ended in summer 2019, during the Commission's pre-filing investigation.

## Transaction Fees Avoided By Buttonwood and Harm to Buttonwood's Clients

55.     During the Relevant Period leading up to the 60/40 arrangement, Buttonwood avoided paying transaction fees on its advisory clients' mutual fund investments when it invested them in higher-cost NTF mutual funds, rather than TF mutual funds.

56.     Following the 60/40 arrangement, Buttonwood avoided paying transaction fees on not only its advisory clients' mutual fund investments, but also on their equities trades, because Buttonwood had agreed to invest at least 60% of all wrap account assets in NTF mutual funds in exchange for the Broker's further economic concession to waive transaction fees on all equity trades and TF mutual fund trades by Buttonwood's advisory clients.

57.     The transaction fees Buttonwood avoided by investing its advisory clients in higher-cost NTF mutual funds were significant.  By investing in NTF mutual funds, rather than TF mutual funds, Buttonwood avoided millions of dollars in transaction fees that it would have had to pay the Broker if it had made the same mutual fund trades for its wrap account clients, but in lower-cost TF mutual funds rather than more expensive NTF mutual funds.

58.     Buttonwood and McGraw's decision to avoid these transaction fees came at their advisory clients' expense.  For example, one Buttonwood advisory client held an average of about $5.8 million in NTF mutual funds during one year.  All of those NTF mutual funds had TF share classes available to the client that had lower expense ratios.  For instance, the client was invested in a First Eagle Global Class A mutual fund, for which the Broker did not charge a transaction fee. That share class had a 1.11% annual expense ratio.  That same fund, however, had another share

class available to the client that had a 0.84% annual expense ratio; however, Buttonwood would have had to pay the Broker $25 each time the client purchased or sold the share class with the lower expense ratio. Overall, because Buttonwood invested this client in higher-expense NTF mutual funds, rather than lower-expense TF share classes of the same mutual fund investments, the client earned about $13,000 less on their investments during that one year.

## Buttonwood and McGraw Failed to Disclose Conflicts of Interest to Advisory Clients

59.     As investment advisers, Buttonwood and McGraw are fiduciaries for their advisory clients and owe their clients a duty of loyalty. As part of the duty of loyalty, Buttonwood and McGraw owe their clients an affirmative duty of utmost good faith, must provide full and fair disclosure of all material facts, and have an obligation to employ reasonable care to avoid misleading their clients. Buttonwood and McGraw's duty to disclose all material facts includes a duty to tell clients about actual or potential conflicts of interest that might incline Buttonwood to render investment advice that is not disinterested.

60.     Buttonwood and McGraw's mutual fund selection practices, including their decision to heavily invest clients in NTF mutual funds, gave rise to a conflict of interest. Defendants' financial interests, and those of their wrap fee advisory clients, were conflicted in light of Defendants' incentive to select certain investments to avoid paying transaction fees. First, Defendants had an incentive to pick NTF mutual funds over all other investments, including individual stocks and TF mutual funds. Second, even when selecting a mutual fund investment, if Buttonwood invested clients in the TF version of a mutual fund, clients economically benefitted from being invested in a lower-cost mutual fund. In that case, however, Buttonwood was economically disadvantaged—it would have to pay a transaction fee, in accordance with its wrap arrangement, on those TF investments. Conversely, when Buttonwood invested clients in the NTF version of a mutual fund, clients were economically harmed from being invested in a higher-cost

mutual fund. Yet in that case, Buttonwood obtained an economic benefit—it did not have to pay a transaction fee, in accordance with its wrap arrangement, on those NTF investments.

61.     The 60/40 arrangement exacerbated the actual conflict of interest arising from Defendants' mutual fund selection practices and decision to heavily invest clients in NTF mutual funds. To obtain an additional economic benefit for themselves—the Broker eliminated transaction fees that Buttonwood previously had to pay on clients' stock and TF mutual fund trading—Defendants invested at least 60% of all wrap fee client assets in higher-cost NTF mutual funds, and in doing so, saddled their advisory clients with an economic harm.

62.     Buttonwood and McGraw failed to provide clients with full and fair disclosure of the financial conflicts of interest arising from their investment selection practices.

63.     Buttonwood and McGraw also failed to provide clients with full and fair disclosure of the financial conflicts of interest arising from their heavy use of NTF mutual funds and the resulting transaction fees Buttonwood avoided having to pay on their clients' mutual fund investments.

64.     Buttonwood and McGraw further failed to provide clients with full and fair disclosure of the financial conflicts of interest arising from the 60/40 arrangement.

65.     The SEC requires Buttonwood to include in its Brochure information designed to provide existing and potential advisory clients with, among other things, a clearly written, meaningful current disclosure of Buttonwood's business practices and conflicts of interest.

66.     For example, during the Relevant Period, Buttonwood's Brochure and separate brochure for its wrap fee program ("Wrap Fee Brochure") did not disclose any material facts relating to the financial conflicts of interest arising from Buttonwood and McGraw's heavy use of

NTF mutual funds and the transaction fees Buttonwood avoided having to pay on their clients' mutual fund investments.

67.    Further, during the Relevant Period, Buttonwood's Brochure and Wrap Fee Brochure did not disclose any material facts relating to the financial conflicts of interest arising from the 60/40 arrangement.

68.    Instead, Buttonwood and McGraw falsely stated to their clients that Buttonwood was paying transactions costs associated with securities trading during the period of the 60/40 arrangement.

69.    For example, Buttonwood's March 2018 Wrap Fee Brochure stated:

> We sponsor a Wrap Fee Program designed to connect our Clients with professional money managers and investment vehicles suitable for their financial circumstances and investment objectives … **Buttonwood pays the transaction/execution costs associated with securities trading, and this may present a disincentive for us to trade securities in a Client account**. Participation in the Wrap Fee Program may cost more or less than if Clients were to purchase the services separately.  Several factors, including trading activity and investment fees, influence the overall costs of managing an account.

(Emphasis added.)

70.     This statement was not true.  During the period of the 60/40 arrangement, Buttonwood and McGraw did not pay transaction fees on any equities and mutual fund trades by their clients, since by agreement, the Broker had waived those transaction fees in exchange for Buttonwood and McGraw's commitment to invest at least 60% of all client assets in higher cost NTF mutual funds.

71.    The Buttonwood Brochures during the Relevant Period were dated October 1, 2013, March 26, 2014, March 27, 2014, July 31, 2014, March 26, 2015, March 21, 2016, March 16, 2017, March 20, 2018, August 21, 2018, September 10, 2018, and March 20, 2019.

72.     The Buttonwood Wrap Fee Brochures during the Relevant Period were dated October 1, 2013, March 26, 2014, March 27, 2014, July 31, 2014, March 26, 2015, March 21, 2016, March 16, 2017, and March 20, 2018, September 10, 2018, March 20, 2019, and August 21, 2019.

73.     In its March 30, 2020 Brochure and Wrap Fee Brochure, Buttonwood disclosed as material changes that it had "updated details and added specific new disclosures related to conflicts of interest in mutual fund share class selection" within its wrap fee program.

74.     This was the first time that Buttonwood and McGraw revealed their previously undisclosed financial conflicts of interest, stating in its March 30, 2020 Brochure and Wrap Free Brochure that:

> Prior to August of 2019, Buttonwood had a custodial arrangement with [the Broker] whereby Buttonwood agreed to maintain a certain percentage of "NTF" (no transaction fee) category mutual funds in client accounts in exchange for lower overall transaction costs.  NTF category mutual funds are mutual funds with share classes made available to investors with a higher expense ratio that allows for trading at no transaction cost.  TF mutual fund share classes charge transaction fees but have a lower expense ratio than NTF share classes, but both classes represent the same underlying investments.  **In this prior arrangement, we had a financial interest in the choice of share classes that conflicted with the interest of clients**.

> Although Buttonwood received no 12b-1 fee reimbursements or other direct payments from [the Broker] for using certain higher cost share classes in client accounts, the arrangement created a conflict of interest in that **Buttonwood had an incentive to choose higher expense ratio NTF category mutual funds rather [than] lower cost TF category mutual funds in order to save Buttonwood trading expenses since Buttonwood would be paying costs for those clients under its Wrap Fee Program**. Buttonwood also had an incentive to not trade accounts holding TF category mutual funds in order to save Buttonwood trading expenses.

(Emphasis added.)

75.     Buttonwood and McGraw therefore breached their fiduciary duty of loyalty to their advisory clients, which required them—as set forth in the firm's compliance manual—to eliminate or at least expose through full and fair disclosure all conflicts of interest that might incline them to

consciously or unconsciously render investment advice that was not disinterested, make full disclosure of all material facts, act with utmost and exclusive loyalty and good faith, and exercise reasonable care to avoid misleading clients.

## Buttonwood's Best Execution Failures

76. An investment adviser's duty of best execution is part of its fiduciary duty of care to clients where the adviser has the responsibility to decide how client trades are executed (typically, choosing a broker-dealer with respect to discretionary accounts). This responsibility arises when the investment adviser controls the circumstances of a client's securities transaction, and is making decisions for the client that may affect the value of the client's trade. An adviser fulfills this duty by seeking to obtain the execution of securities transactions on behalf of a client with the goal of maximizing value for the client under the particular circumstances occurring at the time of the transaction.

77. During the Relevant Period, Buttonwood and McGraw routinely invested their wrap fee clients in certain NTF mutual fund share classes that charged clients higher expenses when TF mutual fund share classes of the same mutual funds that presented a more favorable value to clients, under the particular circumstances in place at the time of the transactions, were available to clients.

78. During the Relevant Period, Buttonwood had no procedures in place designed to evaluate the differing costs associated with share classes of the same mutual fund when Buttonwood invested its clients in mutual funds. Furthermore, when investing clients in mutual funds, Buttonwood and McGraw did not otherwise seek the mutual fund share class available to their clients that offered the most favorable value to their clients under the circumstances.

79. Buttonwood and McGraw therefore breached their fiduciary duty of care to seek best execution of their advisory clients' transactions.

## Buttonwood's Inadequate Compliance Policies and Procedures

80. During the Relevant Period, Buttonwood failed to adopt and implement written compliance policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder in connection with disclosure of conflicts of interest presented by its investment selection practices, or in connection with making recommendations of investments that were in the best interests of its advisory clients.

81. Specifically, during the Relevant Period, Buttonwood's compliance manual had no policies or procedures regarding investments in NTF mutual funds, the investment selection of different mutual fund share classes, the payment of transaction fees by advisory clients, or how the 60/40 arrangement and the related conflicts of interest should be disclosed.

82. Buttonwood therefore failed to adopt written policies and procedures reasonably designed to prevent Advisers Act violations.

## Defendants' Scienter and Unreasonable Conduct

83. During the Relevant Period, McGraw reviewed Buttonwood's disclosures for accuracy, and reviewed and approved all of Buttonwood's investment advisory agreements.

84. McGraw managed client accounts and provided investment advice to clients.

85. As a member of Buttonwood's investment policy committee, McGraw made all investment decisions relating to client wrap account assets.

86. McGraw personally negotiated and agreed to Buttonwood's pricing agreements with the Broker, including the 60/40 arrangement.

87. When McGraw proposed the 60/40 arrangement to the Broker, he believed that the Broker was receiving 12b-1 Fee revenue on Buttonwood client investments in higher expense NTF mutual funds, and sought to obtain further financial concessions for Buttonwood (but not

Buttonwood's clients) by committing to keep at least 60% of client assets in these more expensive mutual funds.

88.     In addition, McGraw played a central role in: (1) Buttonwood's decision to heavily invest its wrap fee clients in higher-expense NTF mutual funds; (2) Buttonwood's decision to secure the 60/40 arrangement from the Broker that provided Buttonwood with direct economic benefits, in exchange maintaining that NTF mutual fund-heavy investment allocation; (3) the review and approval of Buttonwood's disclosures to its advisory clients, which failed to inform them of Buttonwood's financial conflicts of interest arising from clients' NTF mutual fund investments and the 60/40 arrangement with the Broker; and (4) engaging in the foregoing conduct over a significant period of time.

89.     During the period of the 60/40 arrangement, McGraw therefore acted with scienter when engaging in conduct that violated his and Buttonwood's fiduciary duty of loyalty and duty of care to their advisory clients.

90.     During the Relevant Period, McGraw further failed to exercise reasonable care when engaging in conduct that violated his and Buttonwood's fiduciary duty of loyalty and duty of care to their advisory clients.

91.     Because he undertook these actions in the scope of his employment as Buttonwood's founder, president, sole managing member, majority owner, CCO, and investment policy committee member, McGraw's scienter and unreasonable conduct may be imputed to Buttonwood.

## Statute of Limitations and Tolling Agreements

92.     Buttonwood and McGraw's failure to disclose their financial conflicts of interest arising from both their decision to heavily invest wrap fee clients in NTF mutual funds and the 60/40 arrangement with the Broker, their failure to seek best execution for Buttonwood's clients, and Buttonwood's failure to adopt and implement written compliance policies and procedures

reasonably designed to prevent violations of the Advisers Act and the rules thereunder was ongoing and continuous throughout the Relevant Period.

93.     In addition, Buttonwood entered into seven tolling agreements with the Commission for the periods beginning on January 14, 2019, through April 14, 2019; April 15, 2019, through July 15, 2019; July 15, 2019, through January 15, 2020; January 15, 2020, through May 15, 2020; May 15, 2020, through November 16, 2020; November 16, 2020, through May 17, 2021; and May 17, 2021, through November 17, 2021.  Collectively, these agreements toll, as to Buttonwood, the running of any limitations period or any other time-related defenses to the facts alleged in this Complaint for a period of 1039 days.

94.     Further, McGraw entered into a tolling agreement with the Commission for the period beginning on March 24, 2021 through September 24, 2021.  This agreement tolls, as to McGraw, the running of any limitations period or any other time-related defense to the facts alleged in this Complaint for a period of 185 days.

## COUNT I

### Violations of Section 206(1) of the Advisers Act

### (against all Defendants)

95.     The SEC re-alleges and incorporates by reference paragraphs 1 through 94 above.

96.     Buttonwood and McGraw are "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).  Buttonwood is registered with the SEC as an investment adviser.  Buttonwood and McGraw are each in the business of providing investment advice concerning securities for compensation.  During the Relevant Period, McGraw was also an investment adviser due to his ownership, management, and control of Buttonwood.

97.     During the period of the 60/40 arrangement, Buttonwood and McGraw, knowingly or recklessly, employed a device, scheme, or artifice to defraud their advisory clients.

98.     Among other things, Buttonwood and McGraw heavily invested their clients' funds in more expensive NTF mutual funds, thus avoiding transaction fees and keeping a larger share of their clients' wrap fees for themselves.

99.     Buttonwood and McGraw entered into the 60/40 arrangement with the Broker to obtain additional financial benefits for Buttonwood and McGraw (but not their clients) by committing at least 60% of client assets to more expensive NTF mutual funds.

100.    Neither Buttonwood nor McGraw disclosed these financial conflicts of interest to their wrap fee clients during the period of the 60/40 arrangement.

101.    Furthermore, when investing clients in mutual funds, Buttonwood and McGraw did not otherwise seek the mutual fund share class that offered the most favorable value to their clients under the circumstances.

102.    By engaging in the conduct described above, Buttonwood and McGraw, each of them, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, employed a device, scheme, or artifice to defraud their advisory clients.

103.    By engaging in the conduct described above, Buttonwood and McGraw violated, and unless restrained and enjoined will continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## COUNT II

### Violations of Section 206(2) of the Advisers Act

### (against all Defendants)

104.    The SEC re-alleges and incorporates by reference paragraphs 1 through 94 above.

105.    Buttonwood and McGraw are "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).  Buttonwood is registered with the SEC as an investment adviser.  Buttonwood and McGraw are each in the business of providing

investment advice concerning securities for compensation. During the Relevant Period, McGraw was also an investment adviser due to his ownership, management, and control of Buttonwood.

106. Throughout the Relevant Period, Buttonwood and McGraw, negligently and in violation of applicable standards of care, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon their advisory clients.

107. In addition, during the period of the 60/40 arrangement, Buttonwood and McGraw, knowingly or recklessly, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon their advisory clients.

108. Among other things, Buttonwood and McGraw heavily invested their clients' funds in more expensive NTF mutual funds, thus avoiding transaction fees and keeping a larger share of their clients' wrap fees for themselves.

109. Buttonwood and McGraw entered into the 60/40 arrangement with the Broker to obtain additional financial benefits for Buttonwood and McGraw (but not their clients) by committing at least 60% of client assets to more expensive NTF mutual funds.

110. Neither Buttonwood nor McGraw disclosed these financial conflicts of interest to their wrap fee clients during the Relevant Period.

111. Furthermore, when investing clients in mutual funds, Buttonwood and McGraw did not otherwise seek the mutual fund share class that offered the most favorable value to their clients under the circumstances.

112. By engaging in the conduct described above, Buttonwood and McGraw, each of them, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon their advisory clients.

113.    By engaging in the conduct described above, Buttonwood and McGraw violated, and unless restrained and enjoined will continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## COUNT III

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder
### (against Defendant Buttonwood)

114.    The SEC re-alleges and incorporates by reference paragraphs 1 through 94 above.

115.    Rule 206(4)-7 under Section 206(4) of the Advisers Act, 17 C.F.R. § 275.206(4)-7, requires registered investment advisers to adopt and implement written policies and procedures that are reasonably designed to prevent violations of the Advisers Act and its rules.  Rule 206(4)-7 also requires an investment adviser to conduct an annual review of both the adequacy of its written policies and procedures and the effectiveness of their implementation.

116.    Buttonwood violated Rule 206(4)-7 by failing to adopt written policies and procedures reasonably designed to prevent Advisers Act violations.  Specifically, during the Relevant Period, Buttonwood's compliance manual had no policies or procedures regarding investments in NTF mutual funds, the investment selection of different mutual fund share classes, the payment of transaction fees by advisory clients, or how the 60/40 arrangement and the related conflicts of interest should be disclosed.

117.    By engaging in the conduct described above, Defendant Buttonwood violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the Advisers Act, 15 U.S.C. §80b-4, and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Buttonwood, and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)], Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)], and Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining McGraw, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)] and Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

## III.

Issue and Order requiring Defendants to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

## IV.

Order Defendants to pay civil penalties under Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-6(9)(e).

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal

Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

may be entered, or to entertain any suitable application or motion for additional relief within the

jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Respectfully submitted,

Dated: September 23, 2021

SECURITIES AND EXCHANGE
COMMISSION

*/s/ Charles E. Canter*
Charles E. Canter (Cal. Bar No. 263197)
Timothy J. Stockwell (D.C. Bar No. 484238)
Gary Y. Leung (Cal. Bar No. 302928)
Securities and Exchange Commission
444 South Flower Street, Ste. 900
Los Angeles, CA 90071
Telephone: (323) 965-3998
Emails:        canterc@sec.gov
               stockwellt@sec.gov

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION